THOMAS, Judge.
K.P. (“the mother”) gave birth to T.B. (“the child”) in August 2008. At the time of the child’s birth, the mother was incarcerated in the Julia Tutwiler Prison for Women (“Tutwiler”), a state penitentiary. The child was removed from the mother’s custody and placed in the custody of the Etowah County Department of Human Resources (“DHR”) shortly after his birth; DHR placed the child in foster care in Etowah County. Because the mother was incarcerated, DHR provided no services to the mother before or immediately after the removal of the child from the mother’s custody.
The mother was released from prison in November 2008, presumably on probation, although the record is not entirely clear on this point. It appears from the testimony at trial that a condition of the mother’s release was living at the Lovelady Center, a halfway house located in Birmingham. The mother attended an Individualized Service Plan (“ISP”) meeting in November 2008; a representative from the Lovelady Center attended the meeting with the mother. At the ISP meeting, Ann Bentley, the caseworker assigned to the mother’s case at that time, discussed with the mother possible services DHR could offer *604 the mother, which included drug screens, counseling, and parenting classes. Bentley explained at trial that DHR could not provide services to the mother while she was at the Lovelady Center; however, according to Bentley, the representative from the Lovelady Center had indicated that participation in individual and group counseling, random drug screens, and parenting classes was required of the residents of the Lovelady Center. Bentley said that, despite her promise to do so, the representative of the Lovelady Center never provided any documentation to DHR indicating that the mother participated in any of the programs offered at the Lovela-dy Center.
DHR agreed to provide visitation between the child and the mother, but the first visitation date the mother proposed in December 2008 was inconvenient for the foster parents. DHR scheduled a visitation in January 2009; at the time the visitation was scheduled, the mother indicated that she had transportation to Eto-wah County from the Lovelady Center. However, the January visit was canceled when the mother contacted DHR one and a half hours before the scheduled visitation to explain that she no longer had transportation.
At some point before February 2009, the mother left the Lovelady Center on a pass and failed to return. In March, after attempts to reach the mother by telephone and at the Lovelady Center failed, the DHR caseworker then assigned to the mother’s case, Michele Morgan, located the mother at the Etowah County jail. Morgan testified that DHR had rejected the mother’s relatives as potential placements for the child because of issues discovered during their recent investigation of those relatives as potential placements for the mother’s sister’s child, who was also in DHR custody. DHR filed its petition to terminate the mother’s parental rights on April 20, 2009.
At trial, Morgan testified that the mother had been homeless and living on the street before her incarceration. Morgan also testified that the mother had been in and out of jail before her incarceration in 2008. Morgan further testified that the mother had limited mental ability and that the mother had been receiving a supplemental security income (“SSI”) check based on her mental disability before her incarceration. According to Morgan, the mother had difficulty managing everyday tasks, indicating to Morgan that DHR might have issues with the mother’s being able to parent the child even if she were not incarcerated.
By the time of the termination trial in June 2009, the mother had been returned to Tutwiler. She was unable to appear at trial because of her incarceration. After the trial, the juvenile court entered a judgment terminating the parental rights of the mother,[1] finding specifically, among other things, that the mother was incarcerated at Tutwiler and, as a result, that the mother’s condition was such as to render her unable to properly care for the child, that the mother was unable and/or unwilling to discharge her responsibilities to and for the child, and that the mother’s condition was unlikely to change in the foreseeable future. The mother’s timely postjudgment motion and her timely amendment to that motion were denied. The juvenile court extended the time for appeal pursuant to Rule 77(d), Ala. R. Civ. P., based on the failure of the clerk to notify the mother of the judgment, and the mother then appealed the judgment terminating her parental rights to this court. We affirm.
*605 As noted above, the mother did not appear at the trial of the termination petition because of her incarceration. She argues on appeal first that the juvenile court lacked clear and convincing evidence that termination of her parental rights was warranted. Secondly, she argues that termination of her parental rights was not in the best interest of the child. DHR counters the mother’s arguments by relying, in large part, on the fact that the mother’s incarceration alone was sufficient to support a conclusion that the mother was unable to discharge her parental responsibilities to and for the child. See J.F.S. v. Mobile County Dep’t of Human Res., 38 So.3d 75, 77 (Ala.Civ.App.2009); K.W. v. State Dep’t of Human Res., 656 So.2d 849, 850 (Ala.Civ.App.1995). DHR further argues that the child’s best interest was served by termination of the mother’s parental rights because the child needs a permanent and stable home, the mother has never visited with the child, and the child has no bond with the mother or any other maternal relative.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-ll-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995). Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker County Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
Section 26-18-7(a), Ala.Code 1975,[2] specified the grounds for terminating parental rights:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In deciding whether a parent is unable or unwilling to discharge his or her re *606 sponsibilities to and for the child, the juvenile court may consider several factors, including, but not limited to, those that were listed in § 28-18-7(a):
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
“a. Murder or voluntary manslaughter of another child of that parent.
“b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
“c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term ‘serious bodily injury’ means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
“(8) That parental rights to a sibling of the child have been involuntarily terminated.”
When a child is not in the custody of his or her parent, a juvenile court must consider, but is not limited to, the following factors, which were contained in § 26-18-7(b):
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother argues that DHR failed to present evidence of any of the factors listed in § 26-18-7(a) and that DHR failed to provide her any services *607 aimed at rehabilitation. The mother admits that her incarceration prevented her from caring for the child and prevented DHR from rehabilitating her; however, she argues that her impending release from incarceration at the time of trial prevented the juvenile court from determining that her condition was unlikely to change in the foreseeable future and that, during the few months she was not incarcerated between November 2008 and February or March 2009, DHR made no efforts to provide her services. She insists, relying on P.W. v. State Department of Human Resources, 822 So.2d 423 (Ala.Civ.App.2001) (plurality opinion with two judges concurring, one judge concurring in the result, and two judges dissenting), that the termination of her parental rights was premature because, she says, she was not given an opportunity to be rehabilitated.
In P.W., a plurality of this court reversed the termination of a mother’s parental rights because the evidence indicated that the mother was in compliance with several of her ISP goals and that she was making progress toward reunification. P.W., 822 So.2d at 426-27. Because the evidence before the court in P.W. did not support a conclusion that termination of the mother’s parental rights was in the child’s best interest based on a failure of the mother to meet the goals set for her, two judges of this court determined that the judgment terminating the mother’s rights should be reversed. Id. at 427. Even were P.W. binding precedent, the mother in the present case is not in the same situation as the mother in P.W.
The mother in the present case gave birth to the child while incarcerated. She has been incarcerated for nearly all the child’s life. After having been released from incarceration, presumably on probation, the mother failed to complete her probation and instead was again incarcerated because she failed to comply with the requirement that she return to the halfway house to which she had been released. The mother’s actions, not the actions of DHR, resulted in her being placed back into prison, where DHR had no opportunity or duty to provide her services. Even during the short three- to four-month period when the mother was not incarcerated, DHR had no way to provide the mother services; the mother was required to reside in a halfway house in Birmingham where services similar to the ones DHR normally would provide were available. We cannot conclude that DHR failed the mother in any respect by failing to provide her services when it could not have done so. The mother in the present case, unlike the mother in P.W., had not managed to make any improvement in her circumstances despite the chance to do so presented to her by her release from incarceration to the Lovelady Center.
In response to DHR’s responsive brief, in which DHR makes the argument that the mother’s incarceration alone is a sufficient ground to find that termination of her parental rights was warranted, the mother argues in her reply brief that DHR failed to prove that she had been incarcerated for a felony, thus preventing its reliance on § 26-18-7(a)(4), which provided that one factor upon which to base a termination of parental rights was “[cjonviction of and imprisonment for a felony.” The mother relies on D.P. v. Madison County Department of Human Resources, 23 So.3d 1156, 1159 (Ala.Civ.App.2009), in which this court held that the mere fact that the record indicated that a father had been incarcerated for 16 months did not alone prove that he had been convicted of and imprisoned for a felony when he could well have been convicted of and sentenced for multiple misdemeanors. However, the evidence in the present case is that the mother was incarcerated in Tutwiler, *608 which, as noted above, is a state penitentiary. As we explained in J.F.S., a juvenile court may conclude from evidence proving that a parent was incarcerated in a state penitentiary that the parent had been convicted of a felony because one cannot be sentenced to a state penitentiary for a misdemeanor. J.F.S., 38 So.3d at 77 (quoting Ala.Code 1975, § 15 — 18—1(b), and relying on the principle that judges are presumed to know the law, as stated in Ex parte Atchley, 936 So.2d 513, 516 (Ala2006)). Thus, the mother’s reliance on D.P. is misplaced; the juvenile court could properly have determined from the fact that the mother was incarcerated at Tut-wiler that she had been convicted of and imprisoned for a felony.
The mother argues that the juvenile court could not have determined that her condition — incarceration—was unlikely to change in the foreseeable future in light of the fact, recited in the juvenile court’s judgment, that the mother’s release from prison was anticipated to occur on July 19, 2009. The juvenile court could well have determined, based on the mother’s history of repeated incarcerations and her inability to satisfy the conditions of her earlier release, that the mother would very likely continue to be a repeat offender or that, perhaps, if she were on parole, the mother would likely violate the conditions of that parole. The mother’s homelessness before her incarceration could also have indicated to the juvenile court that the mother would not be in a position upon her release to take custody of and provide a safe and stable home for an 11-month-old child with whom she had no relationship. We cannot agree that the juvenile court lacked evidence from which it could infer that the mother’s inability to care for the child would continue into the foreseeable future.
The mother’s final argument is that DHR failed to prove that termination of the mother’s parental rights would be in the child’s best interest. The mother contends that it would be in the child’s best interest to provide the mother services aimed at reunification so that the child would have the ability to be reared by a natural parent. The mother argues that, because this court has recognized that a 12-month period is “a presumptively reasonable time for a parent to rehabilitate,” see M.A.J. v. S.F., 994 So.2d 280, 291 (Ala.Civ.App.2008), DHR’s decision to seek termination of the mother’s parental rights before the expiration of that 12-month period (and perhaps as early as 3 months after the child had entered foster care) and without DHR having offered the mother any services aimed at rehabilitation is proof that the termination of her parental rights is not in the child’s best interest. We disagree.
While a 12-month period is considered the presumptively reasonable period during which a parent should be able to make sufficient progress at reunification to prevent termination of parental rights, MA.J. does not stand for the proposition that seeking a termination of parental rights before the expiration of that period is prohibited or even considered suspect. As the mother points out, MA.J. contains language indicating that the 12-month period might be lengthened in some circumstances warranting additional time for the parent to continue making progress toward reunification; however, MA.J. also contains language indicating that, in cases in which the evidence indicates that continued efforts would be unavailing and would not result in reunification, the 12-month period may be shortened as well. M.A.J., 994 So.2d at 291. In fact, we affirmed the termination of the mother’s parental rights in M.A.J. despite the fact that the Escam-bia County DHR had ceased making rehabilitation efforts eight months after the *609 mother’s twin children were placed in foster care. Id.
The mother’s overriding argument is that her incarceration should not be a basis upon which to terminate her parental rights without first giving her the opportunity to be rehabilitated. However, both § 26-18-7(a)(4), and the current statute, Ala.Code 1975, § 12-15-319(a)(4) (see supra note 2), list a parent’s conviction of and imprisonment for a felony as a basis for finding that parent unable to discharge his or her responsibilities to and for his or her child. The mother’s actions, not DHR’s, placed her in the position of losing custody of her child. The mother’s history of repeated incarceration and her inability to remain out of prison when released in November 2008 reflect in the mother a lack of ability to improve, and a failure of commitment to improving, her circumstances for the sake of her child. The evidence at trial supports a conclusion that termination of the mother’s parental rights was warranted and that termination of those rights was in the best interest of the child. We therefore affirm the termination of the mother’s parental rights.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The judgment also terminated the parental rights of the unknown fadier of the child.

. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered Ala.Code 1975, § 26-18-7, and enacted the Alabama Juvenile Justice Act ("AJJA”), codified at Ala.Code 1975, § 12-15-101 et seq. The effective date of the AJJA is January 1, 2009; the mother has not asserted that the AJJA applies in this case.